**Anne M. QUINN, Plaintiff,**

v.

**The SHERWIN–WILLIAMS COMPANY, Defendant.**

**No. 96–CV705H.**

United States District Court, W.D. New York.

Nov. 5, 1997.

Michael Paskwitz, Buffalo, New York, for Plaintiff Borins, Halpern, Stromberg & Paskowitz.

Thomas S. Gill, Jason A. Yots, Buffalo, New York, for Defendant Saperston & Day, P.C.

## DECISION AND ORDER

HECKMAN, United States Magistrate Judge.

In accordance with 28 U.S.C. § 636(c), the parties have consented to have the undersigned conduct all further proceedings in this case, including entry of final judgment. Both parties have moved for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons that follow, plaintiff's motion is denied, and defendant's motion is granted.

## BACKGROUND

On September 14, 1996, plaintiff filed a summons and complaint in New York State Supreme Court seeking money damages in the amount of $94,627.00 as the difference between the value of Pratt & Lambert stock option rights exercised by plaintiff prior to Pratt & Lambert's November, 1995 merger with defendant Sherwin–Williams Company, and the value of those rights after the merger. On October 15, 1996, defendant (an Ohio Corporation with its principal place of business in Cleveland, Ohio) removed the case to this court pursuant to 28 U.S.C. § 1441(a) on

the basis of diversity jurisdiction. Plaintiff is a New York citizen and resides in Erie County.

The following facts are not in dispute. Plaintiff's husband Geary B. Quinn was an employee of Pratt & Lambert, Inc. at the time of his death on November 18, 1992. On December 15, 1987, Mr. Geary entered into an "Option Agreement" (Item 8, Ex. A) under which he was granted an "Incentive Stock Option" to purchase 2,000 shares of Pratt & Lambert's common stock, in accordance with that company's "1980 Stock Option/Stock Appreciation Rights Plan," as amended and restated as of May 7, 1987 (Item 8, Ex. B)(collectively referred to herein as the "Plan"). During the course of his employment, Mr. Quinn was granted option rights for a total of 6,000 shares of Pratt & Lambert common stock.

The general provisions of the Plan set forth the "Purpose" of Pratt & Lambert's incentive stock option program as follows:

> [T]o advance the interests of the Corporation ... by (i) providing certain ... key employees with additional incentive to promote continued success and profitable growth of the Corporation and the best interests of its shareholders and (ii) enabling the Corporation to compete effectively with others in attracting and retaining key personnel.

(Item 8, Ex. B, p. 4, *see also id.* at p. 17). The Plan also set forth certain general requirements governing the exercise of stock options, as follows:

> The Board [of Directors of Pratt & Lambert] will determine when an option will be exercisable, except that (i) an option cannot be exercised until 12 months after the date of the grant, (ii) an incentive stock option cannot be exercised after 10 years from the date of grant and (iii) a nonqualified stock option cannot be exercised after 10 years and one day from the date of grant. Options will become immediately exercisable in the event of death, retirement or permanent disability and will re-

main so for a period of one year; however, options will be canceled upon any other termination of employment, Options shall not be transferable by the participant other than by will or by the laws of descent and distribution, and shall be exercisable during the lifetime of the participant only by the participant and after death only [by] the participant's legal representative.

(*Id.,* pp. 6–7).

Section 2 of the Plan defined "Successor" as "the legal representative of the estate of a deceased Grantee or the person or persons who shall acquire the right to exercise an Option or an SAR [stock appreciation right] by bequest or inheritance or by reason of the death of the Grantee, as provided in Section 10(c) hereof" (*id.,* pp. 19–20).

Section 9 of the Plan, entitled "TERM AND INSTALLMENTS OF OPTIONS; EXERCISE OF OPTION DURING LIFE OF GRANTEE." provided as follows:

> (a) Each Option granted under this Plan shall be exercisable only during a Term commencing twelve months after the date the Option was granted or during such twelve-month period as provided in Section 10(b and c) in the event of death, retirement or permanent disability of a Grantee and ending (unless the Option shall have been terminated earlier under other provisions of this Plan) on a date to be fixed by the Board, which date shall not be more than ten years after the date of grant of the Option; provided, however, that for an Option which is not intended to be an Incentive Stock Option, the expiration date shall not be more than ten years and one day after the date of grant of the Option.

(Item 8, Ex. B, p. 28).[1]

Section 10 of the Plan, entitled "EXERCISE OF OPTION OR STOCK APPRECIATION RIGHT BY GRANTEE ON CESSATION OF EMPLOYMENT," provided as follows:

> (b) If the Grantee shall cease to be employed by the Company or one of its Sub-

---

1. This section was amended effective November 23, 1992 to allow stock options to be exercised six months after the date the option was granted. rather than twelve months as previously provid-

ed in section 9(a) (*id.,* Ex. G, p. 24). Since Mr. Quinn died on November 18, 1992, this amendment does not pertain to the issues raised by this lawsuit.

sidiaries as a result of retirement with the consent of the Company or as a result of permanent disability, the Grantee shall have the right to exercise any Option or associated SAR held by him on the date of his retirement or permanent disability as to all shares of Common Stock subject to his Option Agreement on the date of his retirement or permanent disability, whether or not his right to exercise shall have accrued at such date. The Grantee must exercise his option within twelve months after his retirement or permanent disability, except that in the event of retirement such exercise may be made within such longer period as the Board may specify upon a determination by it that the continued availability of a retired employee to the Company is of significant benefit to it (but in no event may the Grantee exercise his Option after the date fixed in the Option Agreement as its expiration date).

(c) If a Grantee shall die while employed by the Company, his Option and any associated SAR may be exercised within twelve months from the date of the deceased Grantee's death (but in no event after the date fixed in the Option Agreement as its expiration date) by the deceased Grantee's Successor with respect to all shares subject to his Option Agreement, whether or not his right to exercise shall have accrued at the date of his death.

(Item 8, Ex. B, p. 31). This language remained unchanged in several amended or restated versions of the Plan (*see id.*, Exs. D, G).

On December 2, 1992, after Mr. Quinn's death, Pratt & Lambert's Vice President of Finance James R. Boldt wrote to plaintiff, at her request, advising her of various benefits payable to her as Mr. Quinn's surviving spouse. In his letter, Mr. Boldt set forth a summary of the stock options that had been granted to Mr. Quinn under the Plan, along with the option price and the number of shares, totaling 6,000 (Item 8, Ex. 1, p. 2). Mr. Boldt stated:

You have one year from the date of Geary's death to exercise the aforementioned stock options and can do so by remitting to the company an amount equal to the number of shares that you elect to exercise times the option price.

(*Id.*, p. 3).

On October 4, 1993, plaintiff exercised the options to purchase 6,000 shares of Pratt & Lambert common stock. At that time, the stock was valued at $18.50 per share (Item 8, Ex. L).

On or about November 6, 1995, more than two years after plaintiff purchased the stock. Sherwin–Williams announced its plans for acquisition of Pratt & Lambert (Item 8, ¶ 11). At that time, Pratt & Lambert stock was valued at $20.75 per share (*id.*, Ex. L). On January 5, 1996. after the acquisition and merger, Pratt & Lambert stock reached $35.00 per share (*id.*). On January 9, 1996, Pratt & Lambert stock was suspended by the New York Stock Exchange.

In her complaint, plaintiff alleges that under the plain language of the Plan she had ten years from the date the stock options were granted to exercise the options, rather than one year from the date of her husband's death as she was advised by Mr. Boldt (Item 9, Ex. A, ¶ 7). She claims that but for Mr. Boldt's "demand" that she exercise the stock options within one year from her husband's death, she would have waited to exercise the stock options until after the merger between Pratt & Lambert and Sherwin–Williams, and she would have received the benefit of the increased value of the stock (*id.*, ¶¶ 8–10).

Defendant moves for summary judgment seeking a determination from this court that, as a matter of law, the express language of the Plan required plaintiff to exercise the stock options she acquired as her husband's "successor" within one year from the date of her husband's death. Plaintiff, on the other hand, moves for summary judgment seeking a determination the Plan allowed her a period of ten years from the date that each stock option was granted within which to exercise the option.

For the reasons that follow, plaintiff's motion is denied, and defendant's motion is granted.

## DISCUSSION

### 1. Summary Judgment in a Contract Action.

Summary judgment is appropriate if the pleadings, discovery materials, and affidavits on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). By its terms, Rule 56 contemplates use of summary judgment as an appropriate device "to obtain a declaratory judgment" in a contract case. Fed.R.Civ.P. 56(a); *see, e.g. Schering Corp. v. Home Insurance Co.*, 712 F.2d 4 (2d Cir. 1983); *Morrisville Water & Light Dept. v. USF&G*, 775 F.Supp. 718, 722 (D.Vt.1991).

 Stock option agreements are subject to the same rules of interpretation as ordinary contracts. *See, e.g., Langer v. Iowa Beef Packers, Inc.*, 420 F.2d 365, 368 (8th Cir.1970); *see generally Levey v. Saphier*, 83 Misc.2d 146, 370 N.Y.S.2d 808 (Sup.1975). New York law supplies the substantive rules of contract interpretation in this diversity action. *Christiania General Insurance Corp. v. Great American Insurance Co.*, 979 F.2d 268, 274 (2d Cir.1992). Under New York law, where contract language is unambiguous on its face, summary judgment is an appropriate means of determining as a matter of law the parties' rights and obligations under the contract. *Alternative Thinking Systems, Inc. v. Simon & Schuster, Inc.*, 853 F.Supp. 791, 795 (S.D.N.Y.1994)(citing *American Express Bank, Ltd. v. Uniroyal, Inc.*, 164 A.D.2d 275, 562 N.Y.S.2d 613, 614 (1st Dept.1990), *appeal denied*, 77 N.Y.2d 807, 569 N.Y.S.2d 611, 572 N.E.2d 52 (1991)). In doing so, the court must read the contract as a whole and "arrive at a construction which will give fair meaning to all of the language employed by the parties...." *Tantleff v. Truscelli*, 110 A.D.2d 240, 493 N.Y.S.2d 979, 983 (2d Dept.1985), *aff'd*, 69 N.Y.2d 769, 513 N.Y.S.2d 113, 505 N.E.2d 623 (1987), and must" avoid an interpretation that would leave contractual clauses meaningless. *Two Guys from Harrison, N.Y., Inc. v. S.F.R. Realty Associates*, 63 N.Y.2d 396, 403, 482 N.Y.S.2d 465, 472 N.E.2d 315 (1984), *quoted in Alternative Thinking Systems, supra*, 853 F.Supp. at 795.

 In this case, the parties contend that the language of the Plan unambiguously conveys two different meanings with respect to the period during which plaintiff could exercise the stock options granted to her husband. Therefore, the question for the court is whether the contract language at issue is ambiguous on its face. *See Alternative Thinking Systems, supra; see also W.W.W. Associates, Inc. v. Giancontieri*, 77 N.Y.2d 157, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990). "Ambiguous" contract language is defined as that which is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F.Supp. 987, 994 (S.D.N.Y. 1968), *quoted in Seiden Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992); see also *Walk–In Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir.1987).

 Conversely, contract language is unambiguous when it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference in opinion." *Breed v. Insurance Co. of North America*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978), quoted in *Seiden Associates, supra*, 959 F.2d at 428; *see also Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989). The language of a contract is not made ambiguous simply because the parties urge different interpretations. Nor does ambiguity exist where one party's view "strain[s] the contract language beyond its reasonable and ordinary meaning." *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90, 141 N.E.2d 590 (1957).

### II. Exercise of Options by Successor to Deceased Grantee.

 In this case, defendant urges the court to rule as a matter of law that the

language of the Plan unambiguously establishes a one-year period during which plaintiff could have exercised the stock options granted to Mr. Quinn, measured from the date of his death on November 18, 1992. I find that this is a reasonable interpretation.

The stated purpose of the Plan was to grant incentive stock options to "selected key employees" of Pratt & Lambert as a means of providing "additional incentive to promote the continued success and profitable growth of the company and the best interests of its shareholders" (Item 8, Ex. B, p. 17). The "incentive" vas furnished by the opportunity to purchase an increasing number of shares of the company's stock—at the market price on the date of the grant—the longer the employee remained with the company.[2] In consideration for this opportunity, Mr. Quinn agreed to continue to work for Pratt & Lambert for at least a year from the date of the initial grant before he could exercise the option. This interpretation of Plan language and customary understanding of the purposes of an incentive stock option plan is supported by caselaw from the Second Circuit, as well as from other jurisdictions. *See Lamb v. Emhart Corp.,* 47 F.3d 551, 559–60 & n. 8 (2d Cir.1995)(issuance of stock option constitutes contract between employer and employee supported by consideration of employee's subsequent continued employment)(citing *Ellis v. Emhart Manufacturing Co.,* 150 Conn. 501, 505, 191 A.2d 546 (1963)); *see also Langer v. Iowa Beef Packers, Inc., supra,* 420 F.2d at 368 ("The primary purpose of a company stock option plan is the attraction and retention of desirable employees, and the granting of an option is considered a form of compensation."); *Hann v. Hann,* 655 N.E.2d 566, 571 (Ct.App.Ind.1995)(incentive stock options are "golden handcuffs" tying employee to company)(Chezem, J., dissenting); *Rupprecht v. United States,* 11 Cl.Ct. 689, 691 (1987)(purpose of incentive stock option was to increase employee's proprietary interest in company by encouraging stock ownership), *aff'd,* 829

F.2d 43 (Fed.Cir.1987); *In re Marriage of Hug,* 154 Cal.App.3d 780, 785, 201 Cal.Rptr. 676 (1984)(primary purpose of stock option plan is incentive to contribute to increased value of company's stock in return for privilege of obtaining stock at less than market price); *Broyles v. Synercon Corp.,* 512 S.W.2d 288, 290 (Sup.Ct.Tenn.1974)(in interpreting stock option agreement, court should recognize fundamental purpose of securing and retaining loyal services of desirable employees).

As set forth above, the Plan provides different periods during which a grantee may exercise the option, depending on the grantee's employment status. Under section 9(a) of the Plan, during employment the options could be exercised no sooner than twelve months, and no later than ten years, after the date the options were granted. This is in accordance with the Plan's stated purpose of providing an incentive to the employee to remain with the company and contribute to the growing value of the company's stock.

However, once the grantee ceased to be employed by the company, the period during which the stock options could be exercised changed. As set forth in the general conditions of the Plan, the options "bec[a]me immediately exercisable in the event of death, retirement or permanent disability and ... remain[ed] so for a period of one year ..." (Item 8, Ex. B, p. 7). This accelerated one-year period was further defined in section 10 of the Plan. Under section 10(b), a retired or permanently disabled grantee must exercise the option within one year after the date of retirement or permanent disability. Under section 10(c), that the option of an employee who died while employed by the company *may be* exercised by the successor within one year from the date of death. Under both (b) and (c), no option may be exercised after it expires.

Plaintiff urges the court to rule that the Plan unambiguously grants her the right to exercise the stock options at any time up to

---

**2.** For example, under the Option Agreement signed by Mr. Quinn on December 15, 1987, Mr. Quinn could purchase 500 shares of Pratt & Lambert stock on or after December 3, 1988; 1,000 shares on or after December 3, 1989, 1,500 shares on or after December 3, 1990; and 2,000 shares on December 3, 1991 and until December 3, 1997—all at the market price of $15.625 per share (Item 8. Ex. A. p. 1).

10 years from the date the option was granted. Plaintiff focuses on language contained in section 9(a) of the Plan, which provides that a deceased, retired or permanently disabled grantee's option is exercisable "during such twelve-month period as provided in Section 10(b and c) . . . and ending (unless the Option shall have been terminated earlier under other provisions of this Plan) on a date . . . not more than ten years after the date of grant of the Option. . . ." Plaintiff also focuses on the difference between the mandatory language in section 10(b) ("Grantee *must* exercise his option within twelve months after his retirement or permanent disability") and the permissive language in section 10(c) (option *"may be* exercised within twelve months from the date of the deceased Grantee's death").

According to plaintiff, this language means that plaintiff did not have to exercise the option within one year from her husband's death (as she was advised by Mr. Boldt), but could have waited until ten years from the date of the grant of the option, which would have given her the benefit of the increased stock value resulting from the merger of Pratt & Lambert with Sherwin–Williams. Plaintiff argues that if defendant wanted to limit a deceased grantee's successor to the same one-year period during which a retiree or permanently disabled employee "must" exercise the option, it could have used the same mandatory language.

In order to accept this interpretation, and accord plaintiff a ten-year period during which to exercise the stock options granted to Mr. Quinn, the court would have to ignore the "incentive" aspect of the Plan provided by the availability of an increased number of shares corresponding to the employee's continued service. This incentive certainly does not apply once the employee ceases to be employed by the company. *See Bernard v. IMI Systems, Inc.*, 131 N.J. 91, 618 A.2d 338, 346–47 (1993). It follows that the Plan cannot be construed to give the successor in interest of a deceased employee greater exercise rights than a retiree or permanently disabled employee who actually rendered the benefit to the employer. *See Broyles v. Synercon, supra,* 512 S.W.2d at 291 (incentive

stock option plan cannot be interpreted to allow resigning employee greater rights than employees who stay on the job).

In addition, accepting plaintiff's interpretation would render other contractual language meaningless. Section 9(a) provides that a successor to a deceased grantee may exercise the option "during such twelve-month period as provided in Section 10[ (c) ]. . . ." Plaintiff claims that this provision is modified by the immediately following provision that the exercise period ends "not more than ten years after the date of grant. . . ." Even if this language could be interpreted within the context and purpose of the Plan to pertain to a successor in interest to a deceased grantee of an incentive stock option, the immediately preceding parenthetical language specifically states that the ten-year period applies "unless the Option shall have been terminated earlier under other provisions of [the] Plan. . . ." One such "other provision" is the general condition stated in the Plan that options "bec[a]me immediately exercisable" by the successor upon the grantee's death, and "remain[ed] so for a period of one year" (Item 8, Ex. B, p. 7).

Therefore, when considered in the context of the purpose and language of the entire contract, the provision in section 9(a) of the Plan that the exercise period shall end "not more than ten years after the date of grant" is a limitation rather than an expansion of the one-year period, as provided in both section 10(c) and the general conditions, during which a successor to a deceased grantee could exercise a stock option. In other words, the only reasonable interpretation of this language is that the successor had one year from the employee's death to exercise the stock option, unless the ten-year period during which the employee could have exercised the option (if he or she were still alive) expired sooner.

This result is not changed by the fact that the company used permissive language in describing the period during which a successor to a deceased grantee could exercise the option, in contrast to the mandatory language used in describing the period during which a retired or permanently disabled grantee could exercise the option. As an

example, in *Broyles v. Synercon, supra,* the plaintiff was granted an incentive stock option under a plan that provided for accrual of the option at a rate of 20% per year for a maximum of five years. The plan also provided that "[i]n the event the employment of the holder of an option is terminated, other than by reason of death, the option *may be exercised* by the holder at any time within three months after such termination but not more than five years after the grant thereof." The plaintiff resigned in his second year after the grant of the option, at a time when only 20% of the option had accrued. He sued for the right to exercise the option in full, relying on the permissive language in the exercise clause. The court found that the language was "general and evidence[d] no specific intent to give former employees a right to exercise the full option." 512 S.W.2d at 291. Upon examination of the language of the exercise clause in the context of the entire plan, the court held that the plaintiff's interpretation would defeat rather than effectuate the purpose of the plan, which was to encourage continued employment. *Id.*

Similarly, in this case the language in section 10(c) providing that the option of a deceased grantee "may be exercised within twelve months" by the successor evidences no specific intent to give the successor the same rights as the living grantee. As discussed above with respect to the language in section 9(a), the parenthetical language in section 10(c) providing that the option may be exercised "in no event after the date fixed in the Option Agreement as its expiration date," considered in the context of the "whole instrument" and in light of the underlying purpose of the Plan, *Broyles v. Synercon, supra,* is a limitation rather than an expansion of the twelve-month period during which a successor may exercise a deceased grantee's stock option. In other words, the only reasonable interpretation of this language is that a successor had one year from the date of the grantee's death to exercise the option, unless the ten-year period expired sooner.

Finally, this interpretation is supported by the absence of any Plan language expressly providing that the successor to a deceased grantee had ten years from the date of the the grant to exercise the option.

Accordingly, I find that under the plain language and stated purpose of the Plan, plaintiff had twelve months from the date her husband died to exercise the stock options granted to him as an incentive for his continued employment and job performance, or lose the opportunity altogether. Plaintiff's interpretation of the Plan language, which would have given her the opportunity to exercise the stock options for a ten-year period from the date the option was granted, is unreasonable as a matter of law.

Defendant is therefore entitled to summary judgment dismissing the complaint.

### CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (**Item** 8) is GRANTED. Plaintiff's motion for summary judgment (**Item 15**) is DENIED.

The Clerk of the Court is directed to enter judgment in favor of defendant.

**SO ORDERED.**